**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**CASE NO.:  2:20-cv-403**

JEFFREY LEZARK, individually and
on behalf of all others similarly situated,

        Plaintiff,

v.

I.C. SYSTEM, INC.,

        Defendant.

---

**<u>DEFENDANT'S BRIEF IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION</u>**

    AND NOW, comes Defendant, I.C. SYSTEM, INC., and files this Brief in Opposition to Motion for Class Certification, averring as follows:

## I.    Introduction

    This Court cannot award damages to class members lacking Article III jurisdictional standing, which must be proven by evidence at the summary judgment stage, and again at trial. The "Survey" is fatally defective because it was designed, conducted, and interpreted by Plaintiff's counsel to support class certification. Defendant has the right to challenge each class member's standing through discovery, summary judgment, and trial. That process would inevitably lead to mini-trials, contrary to the fundamental purpose of Rule 23.

## II.    The Second Amended Complaint

    On March 20, 2020, Plaintiff filed his Complaint alleging that Defendant's April 1, 2019 debt collection letter (the "Collection Letter") "is false, deceptive, and misleading because it implies that legal action is possible when legal action is possible with respect to the Account" in

violation of § 1692e and § 1692f. *See* Doc. 1, ¶¶ 50, 44.  On March 29, 2022, the Court entered an Order granting Defendant judgment on the pleadings. *See* Doc. 61. Plaintiff appealed that ruling to the Third Circuit Court of Appeals. *See* Doc. 69.

On appeal, the Defendant argued that the original Complaint failed to create Article III jurisdiction because it lacked factual allegations sufficient to demonstrate that he suffered a "concrete injury" caused by the alleged FDCPA violations. *See* App. Doc. 27. On March 23, 2023, the Third Circuit remanded the case to the District Court "in order to give Lezark opportunity to move for leave to amend his complaint to include additional allegations of concrete injury." *See* App. Doc. 44.

The Plaintiff thereafter filed a Second Amended Complaint, again alleging that the Collection Letter "is false, deceptive, and misleading because it implies that legal action is possible when legal action is not possible and/or intended" in violation of § 1692e and § 1692f. *See* Doc. 91, ¶¶ 50, 75. And the Plaintiff added the following allegations of "harm" designed to create Article III standing:

> 45. The false belief the 540 Letter instilled in Plaintiff made him feel overwhelmed because, prior to receiving the 540 Letter, Plaintiff had been experiencing financial difficulty and was in fear of losing his home.
>
> 46. Because Plaintiff could not afford to be sued at the time he received the 540 Letter, Plaintiff contacted an attorney for help.
>
> 47. Plaintiff ultimately decided to file for bankruptcy protection.
>
> 48. This decision was due to other financial issues Plaintiff was experiencing, but the 540 Letter helped push Plaintiff to decide to file for bankruptcy, and caused Plaintiff to contact an attorney, because Plaintiff could not afford a lawsuit at the time he received the 540 Letter.
>
> 49. Although the 540 Letter did not cause Plaintiff to suffer any monetary or pecuniary harm, the 540 Letter, among other things,

> denied Plaintiff reliable information to make informed decisions
> about how to address his account, subjected Plaintiff to a deceptive
> and unfair collection practice, and instilled false beliefs in Plaintiff,
> which Plaintiff relied upon in making decisions about how to
> address his account.

*Ibid.*

### III.    Plaintiff's Motion for Class Certification.

In his Brief in Support of Plaintiff's Motion for Class Certification, Plaintiff claims that in addition to himself, "hundreds of others were deceived by" the Collection Letter. *See* Doc. 130, p. 3. To support this allegation, Plaintiff relies on the responses received to a so-called "Claim Form Questionnaire" (the "Survey") that his counsel drafted and had sent to putative class members. *Ibid.* at 4, 12-13. According to Plaintiff:

> Defendant ascertained, from its own records, that there are at least
> 15,083 class members. And Plaintiff's counsel ascertained, from
> records received from the Claim Form Questionnaire administrator,
> that there are at least 747 alternative class members.

*Ibid.* at 12.

Ignoring recent rulings from the Supreme Court and the Third Circuit analyzing Article III standing in both individual and class action lawsuits alleging statutory violations—including violations of the FDCPA—Plaintiff instead argues that standing poses no impediment to class certification based on the Supreme Court's 1982 ruling in *Havens Realty Corp. v. Coleman*. *Ibid.* at 13.

As a fallback position, Plaintiff then argues: "Even assuming the class members do not all have standing under *Havens*, every member of the alternative class has standing under *Huber*." *Ibid.* To support this argument, Plaintiff claims that he:

> and each member of the ***alternative class*** have [sic] demonstrated
> concrete harms that flow directly from their alleged injuries, such
> that they have standing. Indeed, they all experienced stress or

> anxiety because of the 540 Letter, contacted Defendant or attorneys because of the 540 Letter, paid Defendant money because of the 540 Letter, or experienced other concrete harms because of the 540 Letter.

*Ibid.* at 15 (emphasis in original).

Plaintiff claims that 549 respondents to the Survey "'felt anxious, overwhelmed, or stressed because [they] believed that [they] could be subject to legal action or that [their] debt could be referred to an attorney' after reading the language at issue" and "[o]ther respondents stated they contacted attorneys or paid money to Defendant because they feared that they could be subject to legal action if they failed to pay." *Ibid.* at 3. From that conclusion, he claims "that there are at least 747 alternative class members." *Ibid.* at 12, *citing* Ex. K, which Plaintiff describes as a "spreadsheet categorizing responses and calculating number of responses per category, prepared by Plaintiff's counsel."[1]

## IV.    No Standing, No Damages.

In *TransUnion v. Ramirez*, the Supreme Court made clear that federal courts cannot award relief to any class member lacking Article III jurisdictional standing. *Id.*, 141 S. Ct. 2190, 2208 (2021) ("Every class member must have Article III standing in order to recover individual damages."). In that case, the plaintiff filed a class action alleging the defendant violated the rights he and unnamed others enjoyed under the Fair Credit Reporting Act ("FCRA"). *Id.* at 2200. As relevant here, one class claim alleged that "formatting defects in certain mailings sent to them by TransUnion" violated the FCRA. *Id.* The Ninth Circuit ultimately determined that all 8,185 members of this so-called "formatting defects class" had Article III standing and approved a class damages award of around $40 million. *Id.*

On appeal, the Supreme Court ruled that when analyzing jurisdiction in the class action

---

[1] Ex. K is Doc. 130-12.

context, not only the named plaintiff but "[e]very class member must have Article III standing in order to recover individual damages." *Id.* at 2208. While the court agreed with the Ninth Circuit's ruling that those persons whose false information was conveyed by Trans Union to third parties had suffered a concrete injury sufficient to create Article III jurisdictional standing, the same was not true for persons in the "formatting defects class." *Id.*

Analyzing standing, the Court echoed its earlier ruling in *Spokeo v. Robins* rejecting "the proposition that a 'plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Id.* at 2205, *citing Spokeo,* 136 S. Ct. 1540 (2016). The plaintiff argued that members of the "formatting defects class" suffered an "informational injury" and therefore had standing. *Id.* at 2214. But the Court rejected that argument ruling that even assuming an informational injury existed, members of the "formatting defects class" would nonetheless be required to prove they suffered "'downstream consequences' from failing to receive the required information." *Id.* at 2214.

Here, Plaintiff argues the court should ignore *Trans Union* and instead find that each class member has de facto "standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)." *See* Doc. 130 at p. 13. In that case, the Supreme Court held that the plaintiff had standing to pursue a Fair Housing Act claim because the statute "establishes an enforceable right to truthful information concerning the availability of housing" and the plaintiff alleged the information he received was inaccurate. *Id.*, 455 U.S. 363, 373.

But *Havens* is difficult to square with the Supreme Court's more recent rulings in *TransUnion* and *Spokeo*. In fact, *Havens* was cited in Justice Thomas's **dissenting** opinion in *TransUnion. See TransUnion,* 141 S. Ct. at 2218 (J. Thomas, dissenting). And more recently, the

Supreme Court addressed what some perceive as a conflict between *Havens* and the Court's rulings in *Spokeo and TransUnion* by making clear that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *See FDA v. All. for Hippocratic Med*., 144 S. Ct. 1540, 1564 (2024).

Consistent with *Spokeo*, *TransUnion,* and *FDA*, the court must reject Plaintiff's request to adopt Justice Thomas's dissenting opinion in *Trans Union* and certify the class here by relying on *Havens* to certify the class. Not surprisingly, Plaintiff fails to cite a single published decision in which any federal court has applied *Havens* to find standing in an FDCPA case post-*Trans Union*. And binding precedent from the Third Circuit further undermines Plaintiff's argument.

Consistent with *Trans Union*, the Third Circuit has recognized that an "informational injury" can create an injury sufficient for Article III standing in a statutory class action, but only if the plaintiff demonstrates he "'failed to receive [] required information,' and that the omission led to 'adverse effects' or other 'downstream consequences.'" *See Kelly v. Realpage Inc*., 47 F.4th 202, 214 (3d Cir. 2022). Plaintiff—relying on *Havens*—asks the court to certify a class of persons that, at most, suffered an informational injury. And while it would be theoretically possible to certify an informational injury class, each class member would nonetheless have to provide evidence at the summary judgment stage and later, at trial, proving he or she had suffered "'adverse effects' or other 'downstream consequences'" caused by the alleged FDCPA violation. *See Kelly*, supra at 214. Even assuming an informational injury occurred here, Plaintiff proposes no means by which the court could determine *on a class-wide basis* whether any class member suffered "'adverse effects' or other 'downstream consequences'" caused by the informational injury. Common sense compels the conclusion that mini trials would be necessary to determine each class member's standing thereby offending Rule 23(b)(3)'s predominance requirement.

In its 2023 decision in *Huber v. Simon's Agency,* the Third Circuit ruled that an "informational injury" *could* create standing in an FDCPA case, but—citing *TransUnion*—specifically limited that finding to situations in which the plaintiff "fail[ed] to receive [legally] required information." *Id.*, 84 F.4th 132, 146 (3d Cir. 2023). And the court made clear: "unclear disclosures do not equate to outright omissions." *Id.* at 146. Plaintiff does not claim he failed to receive information required by the FDCPA in this case. He instead claims the Collection Letter was misleading. *See*, Doc. 91, ¶ 50 ("The [] Letter is false, deceptive, and misleading because it implies that legal action is possible when legal action is not possible and/or intended.")

Just a few months ago, the Third Circuit revisited the "standing" requirement in another FDCPA case and focused on "the importance of financial or other detrimental consequences to establishing traditional standing under the FDCPA." *George v. Rushmore Serv. Ctr., LLC*, 114 F.4th 226, 235 (3d Cir. 2024).[2] In *George*, the plaintiff, like Plaintiff here, alleged that the defendant violated § 1692e by sending a letter that contained "false, deceptive, or misleading" information. *Id.*, 114 F.4th 226, 230 (3d Cir. 2024). The Court found that the plaintiff lacked standing "because the amended complaint does not allege specific adverse effects flowing from the omission." *Id.* at 236. *George* reinforces what the Third Circuit made clear in *Huber* and the Supreme Court ruled in *Trans Union*: an informational injury without any downstream consequences is insufficient to create Article III jurisdiction.

The *George* Court also rejected the plaintiff's argument that "the injury she has alleged—receipt of a misleading letter—is sufficiently concrete to constitute injury in fact." *Id.* at 237. That argument, according to the Court, "lack[ed] merit" given its earlier decision in *Huber*. *Id.* Plaintiff makes the same argument here by asking the court to find—consistent with *Havens*—that mere

---

[2] Despite the fact the Third Circuit's ruling in *George* was issued nearly **three months before** the Plaintiff filed his brief, the Plaintiff made no mention of the case.

receipt of a misleading debt collection letter creates standing. But that argument "lacks merit."

### V.     The Survey

Recognizing that *Trans Union*, coupled with the predominance requirement of Rule 23(b)(3) creates an insurmountable hurdle to class certification, Plaintiff earlier asked the court to permit him to send the Survey to all 15,083 putative class members to purportedly uncover *evidence* of standing. *See* Doc. 118. In granting Plaintiff permission to conduct the Survey—over Defendant's objection—the court characterized that process as "*limited discovery* as to the putative class members' standing." *See* Doc. 119 (emphasis added). Extensive discovery, as permitted by the Federal Rules of Civil Procedure, has not been undertaken into any class member's standing. Nor has Plaintiff offered a means of conducting that discovery and litigating the issue of each class member's standing that would not result in mini-trials.

And while the Survey was sent to all 15,083 putative class members, only 786—about one-half of one percent (.052%)—of recipients responded. *See* Doc. 130-12, p. 2. Fewer yet (.36%) checked the first box on the questionnaire suggesting they allegedly "felt anxious, overwhelmed, or stressed" after reading the Collection Letter. *Ibid.* That most respondents checked the first box is unsurprising. It is, in fact, entirely consistent with the idea of "Primacy bias," which the web-based survey giant SurveyMonkey describes as:

> the tendency for respondents to pick one of the first options presented to them. This usually happens because it's the first choice they read and agree with or because they're racing through the survey and always pick one of the first options.

https://www.surveymonkey.com/curiosity/eliminate-order-bias-to-improve-your-survey-responses/?ut_source=seo&ut_source2=survey-best-practices%2Fhow-to-avoid-common-types-survey-bias&ut_source3=inline

Consistent with this "tendency," federal courts have recognized the need "to minimize 'order bias'" in surveys conducted for use in litigation. *See, Pebble Beach Co. v. Tour 18 I, Ltd.*,

942 F. Supp. 1513, 1550 (S.D. Tex. 1996); *see also March Madness Ath. Ass'n v. Netfire, Inc.*, 310 F. Supp. 2d 786 (N.D. Tex. 2003) ("The sequence of terms was rotated on different surveys in order to avoid term order bias.") No such effort was made here; it is therefore reasonable to assume "order bias" infected the Survey results.[3] And only discovery directed at the putative class member's claimed injuries—if any—can shed light on the reasons any person responding to the Survey check a specific box.

In the end, the results of the Survey may be anecdotally interesting. But they do not support the conclusion offered by the Plaintiff *i.e.,* that class certification would be proper under Rule 23 based on the survey results. Nor can the survey responses themselves be used to establish "standing" as this case progresses through elevated evidentiary hurdles.

## VI.    Legal Argument

### a)    Plaintiff's counsel's intimate involvement in the Survey renders the results inadmissible.

Plaintiff asks the Court to rely solely on the results of the Survey to certify either a class of all 15,083 putative class members or a limited class of the 786 persons who responded to the survey. *See* Doc. 130-12 at pg. 2. But the Plaintiff does not and cannot argue that the Survey itself or the results are admissible to prove class membership. In ruling on the admissibility of survey results, the Third Circuit has ruled:

> In the context of polls and surveys, the circumstantial guarantees of trustworthiness are for the most part satisfied if the poll is conducted in accordance with generally accepted survey principles, and if the results are used in a statistically correct way, since proper survey and statistical methods are intended to assure a poll's reliability.

*Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978).

---

[3] The Plaintiff provides no evidence from the purveyor of the survey explaining the means by which the survey was created nor the rationale for not changing the order of the response boxes to minimize "order bias."

And the court made clear that:

> the persons conducting the survey ***must be experts***; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, ***the survey must be conducted independently of the attorneys involved in the litigation***.

*Id.* (emphasis added).

The Survey conducted here was infected by countless defects. First, as admitted by Plaintiff in the brief he filed requesting permission from the court to send the questionnaire, the stated purpose of the Survey was not objective, but rather "to satisfy the requirements of *Huber*." *See* Doc. 118, p. 2. Counsel has therefore admitted the goal of the Survey was to assist Plaintiff in obtaining class certification.

Second and more importantly, the Survey was *not* conducted by "experts" *nor* "conducted independently of the attorneys involved in the litigation." *See Pittsburgh Press*, supra at 758. There is, in fact, no evidence that anyone other than "the attorneys involved in the litigation," namely counsel for Plaintiff, was involved in designing or conducting the survey.

In his June 6, 2024 Status Report, Plaintiff told the court that he was "in the process of retaining RG/2 Claims Administration LLC to send and receive the questionnaire to and from class members." *See* Doc. 122. But there is nothing suggesting that RG-2 took part in drafting the Survey much less that it was hired for or qualified to undertake that task. As RG/2's website makes clear, its services are limited to: "court-appointed settlement administrator, claims agent or disbursing agent." https://www.rg2claims.com/services.html.

It is therefore clear that Plaintiff's counsel was responsible for designing and conducting the survey for the purpose of obtaining class certification. That fact alone precludes the court from considering the results of the survey. *See Pittsburgh Press Club*, supra at 758.

When the time came to compile the Survey data, that task too was shouldered entirely by Plaintiff's counsel. In his Brief, Plaintiff's counsel admits that he "ascertained, from records received from the Claim Form Questionnaire administrator, that there are at least 747 alternative class members." *See* Doc. 130, p. 12. And it was again Plaintiff's counsel who "prepared" the "spreadsheet categorizing responses and calculating number of responses per category" as reflected on "Exhibit K" (Doc. 130-12), which purports to interpret the responses to the Survey.

So not only was the Survey proposed and drafted by Plaintiff's counsel[4] with the self-serving purpose of "satisfy[ing] the requirements of *Huber*," but Plaintiff's counsel also took it upon himself to analyze the data and provide the court a spreadsheet of his own making interpreting the results of the Survey. "The failure of a survey to comport with generally accepted survey principles, with the results used in a statistically correct way, renders that survey inadmissible." *Evans v. Phila. Hous. Auth.*, 1995 U.S. Dist. LEXIS 4309, at *17 (E.D. Pa. Mar. 30, 1995).

    **b)**    **Plaintiff has failed to demonstrate that determining each class member's standing would not flout Rule 23(b)(3)'s predominance requirement.**

In his Brief, Plaintiff attempts to side-step the "elephant in the room" by arguing that each class member necessarily has standing under *Havens*. *See* Doc. 60, p. 14. This argument is little more than a so-called "Hail Mary" pass in football. If Plaintiff truly believed *Havens* was decisive in his favor and established that persons receiving misleading collection letters automatically have standing to pursue FDCPA cases, there would be no need to argue standing at all much less invest the time and money into the defective Survey.

But as we know, the Supreme Court rejected—in both *Spokeo* and *TransUnion*—"the

---

[4] Although Defendant was ordered to coordinate with Plaintiff regarding the questionnaire (which is a survey for all intents and purposes), when there was a dispute between the parties, the requests of Defendant were denied. *See, Docs. 121 and 123.* Defendant opposed the use of the questionnaire at all.

proposition that a 'plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *See Spokeo*, 136 S. Ct. 1540; *Trans Union*, 141 S. Ct. at 2205. And the Court made clear just a few months ago, that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *FDA*, 144 S. Ct. at 1564. Because *per se* standing does not exist here, Plaintiff must provide some method for determining each class member's standing that wouldn't require individualized rulings that would violate Rule 23(b)(3)'s for the court to grant class certification. But he has not and cannot.

In *Lujan*, the Supreme Court ruled that the burden of proof placed on plaintiffs with respect to Article III jurisdictional standing increases as the litigation moves forward. After detailing the three distinction elements of standing, the Court noted:

> …each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice…. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts []. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id.*, 112 S. Ct. 2130, 2136-37 (1992).[5]

Applying the rationale in *Lujan*, the Court in *TransUnion* recognized that the plaintiff himself had offered evidence establishing his standing but "he did not present evidence about the experiences of other members of the class." *Ibid.* at 2202. The lack of evidence rendered the "formatting defect class" fatally flaw because:

> [T]he class members other than the named plaintiff Sergio Ramirez

---

[5] In its July 18, 2023 Opinion and Order, the court rightly recognized the increasing evidentiary burden the plaintiff and putative class members face in this case. *See* Doc. 90 at p. 5.

have not demonstrated that the alleged formatting errors caused them any concrete harm. Therefore, except for Ramirez, the class members do not have standing [].

*Id.*, at 2200.

The same is true here, meaning that even if the Court were to determine that the responses to the Survey are "evidence" and limit the class to persons responding to the Survey—as Plaintiff alternatively urges the court to do—Defendant would still have the right to go beyond the "limited discovery" generated by the Survey and conduct full discovery into each class member's claimed injury. In *Trans Union*, the Court rejected the argument that putative class members should not face the same discovery on standing because class actions are more efficient than litigating hundreds of similar claims, stating:

> Some advocate that the concrete-harm requirement be ditched altogether, on the theory that it would be more efficient or convenient to simply say that a statutory violation and a cause of action suffice to afford a plaintiff standing. But as the Court has often stated, the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.

*Id.*, 141 S. Ct. at 2207 (2021) (internal citations omitted).

Each putative class member here must prove that he/she "opened" and read the Defendant's letter and suffered a "downstream consequence" as a result. *See TransUnion*, supra at 2213 ("The plaintiffs presented no evidence that, other than Ramirez, a single other class member so much as *opened* the dual mailings, nor that they were confused, distressed, or relied on the information in any way.") (internal citations omitted) (*italics* in original); *see also Huber,* 84 F.4th at 141.

Depositions of putative class members might lead to the need for further discovery since some of those responding to the Survey allegedly claimed to have consulted third parties after receiving the Collection Letter. And depending on what the sum-total of discovery ultimately

revealed, the Defendant would then have the right to file summary judgment motions attacking the standing of certain class members. Any class member whose claims survived summary judgment would still be required to prove at trial that he/she suffered a concrete injury caused by the Collection Letter. *See Lujan*, supra at 2136-37.

The plain fact is that *TransUnion* compels this Court to affirmatively determine that each putative class member has Article III standing before awarding that class member damages. And *TransUnion* also forecloses any argument that merely receiving a letter that violates the FDCPA creates an injury sufficient to create Article III standing. This Court must therefore analyze facts peculiar to each class member to determine whether any specific class member has standing *before* awarding damages.

Plaintiff has failed to propose a class-wide method for proving on a class-wide basis at trial whether anyone other than him received and read the Collection Letter. He has also necessarily failed to provide a method for proving on a class-wide basis at trial that any putative class member suffered what the Supreme Court in TransUnion called "downstream consequences" from reading the Collection Letter. *See Trans Union*, supra at 2214. And the evidentiary absence of downstream consequences precludes a finding that any putative class member has Article III standing, even if the Collection Letter was mailed and received. *Id*. at 2213 ("Without any evidence of harm caused by the format of the mailings, these are bare procedural violations, divorced from any concrete harm.") (internal citations and quotations omitted).

While decided pre-*TransUnion* and involving claims under the Telephone Consumer Protection Act ("TCPA"), the Eleventh Circuit Court's ruling in *Cordoba v. DirecTV* is on point and demonstrates the fatal defect in the Plaintiff's request for class certification. In that case, the plaintiff filed a class action claiming DIRECTV's telemarketer Telecel violated the TCPA by

failing to maintain the internal "do-not-call" list mandated by the FCC. *Id.*, 942 F.3d 1259, 1263-64 (11th Cir. 2019). At some point after receiving telemarketing calls from Telecel on behalf of DIRECTV, Cordoba demanded no more calls, but the calls continued, so he sued claiming Telecel's failure to keep the required list—which would have included his name—violated the TCPA and harmed him. *Id.* The case came before the Eleventh Circuit on an interlocutory appeal of the district court's order certifying a Rule 23(b)(3) class composed of "all individuals who received more than one telemarketing call from Telecel on behalf of DIRECTV on or after October 27, 2011, during which time Telecel failed to adhere to the internal do-not-call list regulations set." *Id.* at 1266. The district court did not specifically address whether each class member's Article III standing could be determined by classwide proof in its order certifying the class. It instead ruled all class members "had standing because an unsolicited phone call is an injury in fact." *Id.* The defendant filed a Rule 23(f) petition, which the Eleventh Circuit granted to address:

> 1) "whether the members of the internal do-not-call list class who did not ask to be put on the internal do-not-call list have standing;"
>
> 2) "whether the court could award relief to class members lacking standing;" and
>
> 3) "whether the district court abused its discretion by failing to determine if the individualized issue of each class member's standing predominated common issues thereby making certification under Rule 23(b)(3) improper."

*Id.* at 1268.

The court acknowledged that Cordoba himself had standing since he "repeatedly asked Telecel and DIRECTV to stop calling him," Telecel did not maintain a do-not-call list, and the plaintiff "suffered the injury of receiving many phone calls, which would not have happened if Telecel had maintained an internal do-not-call list and abided by it." *Id.* at 1264. But the same

could not be said for every other class member because:

> …[t]he unnamed members of the putative class who did not ask DIRECTV to stop calling them -- and thus would not have been on the internal do-not-call list, even if it had existed and had been maintained perfectly -- were not injured by the failure to comply with the regulation. That means their injuries are not fairly traceable to DIRECTV's alleged wrongful conduct, and therefore they lack Article III standing to sue DIRECTV.

*Id.*

Because many class members likely lacked standing, the court concluded that the district court abused its discretion by certifying a 23(b)(3) class without first evaluating whether the issue of each class member's standing created a "predominance" hurdle to class certification. According to the court, that evaluation was mandated because "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Id.*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring).[6] Simply stated, class members lacking standing were "uninjured" and the district court therefore could not grant them relief, even if they met the class definition. The *Cordoba* court first found that the class as defined included an indeterminate number of people lacking Article III standing and that the district court was prohibited from awarding those persons relief. *Id.* It then turned to "the more difficult question [of] what part this plays in the class certification analysis, and particularly how it may affect the Rule 23(b)(3) predominance inquiry" which requires a finding that common issues to predominate over individual ones. *Id.* at 1272. According to the court, "[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member" and therefore, "common issues will

---

[6] In *TransUnion*, the Supreme Court specifically cited Chief Justice Roberts's concurrence in its ruling. *Id.*, 141 S. Ct. at 2208 ("Every class member must have Article III standing in order to recover individual damages. 'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.'" *Tyson Foods, Inc.* v. *Bouaphakeo*, 577 U. S. 442, 466, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) (Roberts, C. J., concurring)."

not predominate over individual questions if, as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Id*. at 1273-74 (internal citations omitted).

To ensure the predominance requirement of Rule 23(b)(3) was satisfied, the Eleventh Circuit ruled the district court needed to have conducted a "common vs. individual issues" analysis *and concluded* that the determination of whether each class member suffered an "injury" sufficient to create standing was "subject to class wide proof." *Id*. The court emphasized that "at some time in the course of the litigation the district court will have to determine whether each of the absent class members has standing before they could be granted any relief [and] [t]hat is an individualized issue." *Id*. Having determined that "the unnamed class members' standing posed a powerful problem under Rule 23(b)(3)'s predominance factor" and that the district court "abused its considerable discretion in not considering" that problem and remanded the case to the district court to conduct a predominance analysis consistent with its ruling, which it summarized as follows:

> We do not hold today that a court is required to ensure that the class definition does not include any individuals who do not have standing before certifying a class. Such a rule would run the risk of promoting so-called "fail-safe" classes, whose membership can only be determined after the entire case has been litigated and the court can determine who actually suffered an injury. Rather, we only hold that in this case the district court must consider under Rule 23(b)(3) before certification whether the individualized issue of standing will predominate over the common issues in the case, when it appears that a large portion of the class does not have standing, as it seems at first blush here, and making that determination for these members of the class will require individualized inquiries.

*Id*. at 1276-77.

### c)    Relying on responses to the Questionnaire to establish standing would violate Defendant's due process rights.

Defendant is unaware of a ruling from any federal appeals court, including the Supreme

Court—nor has Plaintiff cited any such ruling—relying solely on survey answers to establish putative class member's Article III jurisdictional standing through trial. The Third Circuit has, in fact, strongly "caution[ed] … against approving a method that would amount to no more than ascertaining by potential class members' say so." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012). And IC "must be able to challenge class membership." *See Carrera v. Bayer Corp.*, 727 F.3d 300, 309 (3rd Cir. 2013). Plaintiff is therefore required to offer a method for determining standing that does not run afoul of Rule 23(b)(3) predominance requirement. *See Cordoba*, supra at 1273-74 ("unnamed class members' standing poses a powerful problem under Rule 23(b)(3)'s predominance factor").

Plaintiff's lack of confidence in his own argument is exposed by his suggestion that the court to "certify an ***alternative class*** of: 'All individuals who: signed, dated, and returned the Claim Form Questionnaire; checked the first, second, third, fourth, and/or fifth box on the Claim Form Questionnaire; and did not indicate that the failed to receive or read the 540 Letter." *See* Doc. 130 at p. 4. And while Plaintiff's recognition that the 15,083-member class cannot be certified because the standing analysis would require mini-trial, his alternative argument that the court can certify a class consisting of persons who checked the right box on the Survey is little more than a difference of degree not of substance. Regardless of whether the class were composed of all 15,083 persons to whom IC sent the Collection Letter or the 747 persons that responded to the Survey, the court would have to determine each class member's standing before awarding any relief. And the Plaintiff has utterly failed to offer any process for determining each class member's standing that wouldn't require a fact-specific review.

## VII.    Conclusion

No standing, no damages. Even in the class action context, Defendant has an absolute right

to challenge the standing of each class member. Plaintiff has failed to even suggest, must less prove, that a reasonable method can determine each class member's standing that would not require mini-trials, which Rule 23(b)(3) prohibits.   As such, Plaintiff's Motion for Class Certification must be denied.

WHEREFORE, Defendant, I.C. SYSTEM, INC., respectfully requests that this Honorable Court deny Plaintiff's Motion for Class Certification.

Respectfully submitted by:

**MARSHALL DENNEHEY, P.C.**

PA ID No. 88326
Union Trust Building, Ste. 700
501 Grant Street
Pittsburgh, PA  15219
dmvugrinovich@mdwcg.com
**Counsel for Defendant**